UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

Case No. 23-49061

RICHARD HARRY CLARK,

Chapter 13

Debtor.

Judge Thomas J. Tucker
_____/

JILLIAN CLARK,

Plaintiff,

vs.

Adv. Pro. No. 24-4021

RICHARD HARRY CLARK,

Defendant.
_____/

**OPINION REGARDING THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**I. Introduction**

An individual who owes a debt that is a "domestic support obligation," as that term is

defined in the Bankruptcy Code, cannot obtain a discharge of the debt under any chapter of the

Bankruptcy Code, including Chapter 7 and Chapter 13.[1]  This adversary proceeding is a dispute

---

[1]  For example, Bankruptcy Code § 523(a)(5) states:

> (a) A discharge under section 727, 1141, 1192[,] 1228(a), 1228(b), or
> 1328(b) of this title does not discharge an individual debtor from any
> debt—
> . . .
>
> (5) for a domestic support obligation[.]

11 U.S.C. § 523(a)(5).  Bankruptcy Code § 1328 reinforces this for Chapter 13 cases.  It makes clear that
a discharge under Chapter 13, whether a normal discharge under § 1328(a) or a hardship discharge under
§ 1328(b), does not discharge any debt that is a domestic support obligation under § 523(a)(5).  *See* 11
U.S.C. §§ 1328(a)(2), 1328(c)(2).  The term "domestic support obligation" is defined in Bankruptcy
Code § 14A, 11 U.S.C. § 101(14A), and the meaning of that term is discussed in Part V of this Opinion,

between a Chapter 13 Debtor, Defendant Richard Clark (the "Debtor"), and his former spouse, Plaintiff Jillian Clark (the "Plaintiff"). The dispute is whether, and to what extent, the debt that the Debtor owes to the Plaintiff under a judgment of divorce is nondischargeable under 11 U.S.C. §§ 523(a)(5) and 1328(a)(2), as a domestic support obligation.

The Court held a hearing on May 15, 2024, on the Plaintiff's motion entitled "Plaintiff's Motion for Summary Judgment And to Dismiss Counter-Complaint" (Docket # 20, the "Motion"). The Court decided the Motion in part, in an Order entered on May 17, 2024 that dismissed the Debtor's counterclaim.[2] The remainder of the Motion, in which the Plaintiff seeks summary judgment on Count I of her complaint, is still pending. After the hearing, the Court ordered the parties to file certain supplemental papers, and the parties did so. The Motion is now ready for decision.

The Court has considered all of the written arguments and exhibits filed by the parties, including the post-hearing supplemental papers, as well as the oral arguments of the parties made during the hearing. For the reasons stated in this Opinion, the Court will grant summary judgment for the Plaintiff. The entire debt at issue is a domestic support obligation, so it is entirely nondischargeable.

## II. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and LR 83.50(a) (E.D. Mich.). With respect to every claim pled in the Plaintiff's Complaint (Docket # 1), and every claim pled in the Debtor's recently

below.

[2] "Order Dismissing Defendant's Counterclaim" (Docket # 39).

dismissed counterclaim (Docket # 6), this is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

In addition, this adversary proceeding falls within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within either of these categories in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen* (*In re Trans-Industries, Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). This is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," *see id.*, namely Bankruptcy Code §§ 523(a)(5) and 1328. And this is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *See Allard v. Coenen*, 419 B.R. at 27.

## III. Summary judgment standards

In ruling on the Motion in this case, the Court is applying the principles applicable to summary judgment motions, which the Court has discussed in, among prior published opinions, the Court's opinion in the case of *Schubiner v. Zolman* (*In re Schubiner*), 590 B.R. 362, 376-77 (Bankr. E.D. Mich. 2018). The Court incorporates that discussion into this Opinion by reference.

## IV. Facts

The relevant facts include the following, as well as additional facts stated in Part V of this Opinion, below. Except as otherwise indicated, these facts are undisputed.

### A. The Debtor and his bankruptcy case

The Debtor is an attorney whose practice has included, among other things, many years of representing debtors in bankruptcy cases, including many Chapter 13 cases filed in this judicial district. The Debtor is representing himself in this adversary proceeding, and also in his

3

bankruptcy case.

The Debtor filed his bankruptcy petition on October 16, 2023, under Chapter 7 of the Bankruptcy Code. On December 14, 2023, the Debtor filed a motion to convert the case to Chapter 13.[3] While that motion was pending, the Plaintiff filed this adversary proceeding, on January 18, 2024. The Debtor's conversion motion was granted, and the bankruptcy case was converted to Chapter 13, on February 6, 2024.[4]

To date, no Chapter 13 plan has been confirmed. The Debtor filed a proposed Chapter 13 plan on February 2, 2024.[5] The Chapter 13 Trustee and the Plaintiff filed objections to confirmation.[6] Currently an adjourned confirmation hearing is scheduled for October 24, 2024.

## B. The Debtor's debt to the Plaintiff under the divorce judgment

The debt owing by the Debtor to the Plaintiff is based on a judgment entitled "Judgment of Divorce" that was entered on April 6, 2023 (the "JOD")[7] by the Circuit Court for the County of Oakland, Michigan (the "State Court"), in the parties' divorce case, *Jillian T. Clark v. Richard H. Clark,* Case No. 21-505969-DM (the "Divorce Case").

The Divorce Case was lengthy and very contentious, and included 11 days of trial,[8] after which the State Court filed a 112-page written opinion, on January 17, 2023 (the "State Court

---

[3]  *See* Docket # 48 in Case No. 23-49061.

[4]  *See* Docket # 62 in Case No. 23-49061.

[5]  Docket # 56.

[6]  *See* Docket ## 72, 76 in Case No. 23-49061.

[7]  A copy of the JOD is attached as Exhibit B to the Plaintiff's Complaint (Docket # 1-2).

[8]  *See* JOD (Docket # 1-2) at pdf p. 2.

4

Opinion").[9]  The State Court Opinion noted that the Debtor "retained seasoned and exceptionally competent counsel to represent him in this matter."[10]

The JOD was based on the State Court Opinion, and in fact, the JOD incorporated that opinion by reference.[11]  As is relevant to this adversary proceeding and the Plaintiff's Motion, the JOD imposed liability on the Debtor to pay to the Plaintiff the following sums, as itemized in the Plaintiff's second amended Proof of Claim filed in the Debtor's bankruptcy case (Claim 6-3 in the Claims Registry for Case No. 23-49061, the "POC").  The itemization attached to the POC stated the following, as a list of the amounts that the Plaintiff claims are owing to her by the Debtor under the JOD, all of which the Plaintiff contends are domestic support obligations:

> The following is an itemization of the domestic support obligations of Debtor Richard Harry Clark, pursuant to the April 6, 2023 Judgment of Divorce, attached hereto as Exhibit A:
>
> Monthly Child Support Payments: $1,430.00
>
> Monthly Spousal Support Payments: $3,300.00
>
> Additional Gross [Monthly] Spousal Support Payments until a total amount of $105,750.33 is paid: $1,390.65
>
> The above obligations were **$38,683.20** in arrears as of the filing of Debtor's [Bankruptcy] Petition on October 16, 2023. See *CP Financial Data Report,* attached hereto as Exhibit B.
>
> Property Award: $98,001.56

---

[9]  A copy of the State Court Opinion is attached as Exhibit A to the Plaintiff's Complaint (Docket # 1-1).

[10]  State Court Opinion (Docket # 1-1) at pdf p. 8.

[11]  *See* JOD (Docket # 1-2) at pdf pp. 2-3.

Debtor's Contribution to Creditor's Attorney Fees and Costs:
$67,328.13

Note that all of the above obligations were determined to be central to the future maintenance and support of Creditor Jillian Clark and the parties' children and/or were incurred for the benefit of the parties and their children pursuant to the Judgment of Divorce, . . . .[12]

As stated in the POC, these itemized amounts total $204,012.89 as of the petition date in the Debtor's bankruptcy case.[13]

The Plaintiff's POC is correct in stating that the JOD ordered the Debtor to pay the Plaintiff all of the foregoing amounts.[14]

**C. The State Court stated, and clearly intended, that all components of the Debtor's debt under the JOD debt were in the nature of financial support and maintenance for the Plaintiff and the minor children.**

The JOD stated that all of the amounts to be paid by the Debtor were intended to be in the

---

[12] POC at pdf p. 4 (Claim 6-3 in the Claims Registry for Case No. 23-49061) (citation to and quotation of page 19 of the JOD omitted) (bold in original). The Court notes that the Plaintiff's Complaint included certain additional obligations in the JOD that were not listed in the Plaintiff's later amended proof of claim (the POC, quoted above). In the Court's view, by filing that amended proof of claim, the Plaintiff narrowed the list of JOD obligations at issue in this adversary proceeding.

[13] The Debtor recently filed an objection to the POC, and a hearing on that objection is currently scheduled for August 29, 2024. (*See* Docket # 102 in Case No. 23-49061). The Court's ruling on the Plaintiff's present Motion likely will have a significant impact on the Debtor's pending claim objection.

[14] *See* JOD (Docket # 1-2) at pdf p. 9, § IV.A.1 ($1,430.00 per month in child support, to be reduced as each minor child reached the age of 18, or if still in high school, up to the age of 19.5 years); pdf pp. 10-11, § V.A ($3,300.00 per month in spousal support for 90 months "or until further order of the Court"); pdf p. 11, § V.B ("additional gross spousal support" of $1,390.65 per month "until such time as [the Debtor] has paid the total additional gross spousal support sum of $105,750.33"); pdf p. 12, § VIII.B.2 ("Property Award" of $98,001.56, to be paid by the Debtor to the Plaintiff "within 90 days"); pdf p. 18, § XI.B ($67,328.13, to be paid by the Debtor to the Plaintiff "within 90 days," as the Debtor's "contribution towards Plaintiff's attorney fees and costs incurred up through the last day of trial").

6

nature of financial support and maintenance for the Plaintiff and her children.[15] The child

support and spousal support payment obligations, of course, are explicitly labeled as "support."

And as for the spousal support payments, the JOD states:

> The spousal support obligations in this Judgment are not
> dischargeable in bankruptcy as they are for the support and
> maintenance of Plaintiff and the parties' children and [are]
> enforceable through this Court's powers of contempt.[16]

As for the $67,328.13 in attorney fees, the JOD states: "This amount shall not be dischargeable in

bankruptcy as this Court believes the obligation is central to the future maintenance and support

of Plaintiff and the minor children."[17] And as for *all amounts* the Debtor was obligated to pay to

the Plaintiff under the JOD, including the $98,001.56 amount labeled as a "property award," the

JOD made clear that the State Court intended it all to be in the nature of support and

maintenance:

> **M. <u>Non-Dischargeability of Court-Ordered Obligations</u>.** The
> award to each party under this Judgment is assumed to be a
> domestic obligation that is not dischargeable under the Bankruptcy
> Code 11 USC [§] 523(a)(5). All monies each respective party may
> owe the other pursuant to property settlement and hold harmless
> provisions in this Judgment of Divorce shall likewise be non-
> dischargeable in bankruptcy. In the event either party files
> bankruptcy and it is determined that the monies said bankruptcy
> debtor may owe to the other party is dischargeable in bankruptcy,
> then said monies to the full extent owed the other party shall be
> automatically converted to non-dischargeable spousal support

---

[15] At the time of entry of the JOD, the parties had three minor children, ages 15, 12, and 10. (*See* State Court Opinion (Docket # 1-1) at pdf p. 2). All three therefore are still minors as of this writing.

[16] JOD (Docket # 1-2) at pdf p. 11, § V.C.

[17] *Id.* at pdf p. 18, § XI.B.

payable to the other party.[18]

This provision made clear that even the $98,001.56 "Property Award" component of the JOD was considered and intended by the State Court to be in the nature of support and maintenance for the Plaintiff and her children. If it were not, it could not qualify as a nondischargeable debt under Bankruptcy Code § 523(a)(5), as a domestic support obligation. *See* discussion in Part V of this Opinion, below.

The State Court Opinion, on which the JOD was based, also makes clear, in numerous passages, that the State Court intended all of the Debtor's payment obligations to the Plaintiff to be in the nature of support and maintenance, and viewed them as necessary for the financial support and maintenance of the Plaintiff and the children.

For example, in discussing the two components of the spousal support award to the Plaintiff, which the State Court called the "sporadic spousal support payments" of $3,300.00 per month and the separate "gross spousal support" award that became $105,750.33 payable at the rate of $1,390.65 per month,[19] the State Court stated the following:

> [A]ccording to 11 USC [§§] 523(a)(5) and (15), a domestic support obligation or obligation owed for the maintenance and support of the spouse and minor children, as determined in a divorce order, are not dischargeable.
>
> To be clear, it is this Court's intention to award spousal support in gross and in sporadic payments for the **maintenance and support** of Plaintiff Mom and the minor children. Given the extensive depletion [by the Debtor] of marital assets, the secreting of what was arguably separate funds in the form of a life insurance check that was diminished in its entirety through gambling in [the

---

[18] *Id.* at pdf p. 20, § XII.M (bold and underlining in original).

[19] *See* State Court Opinion (Docket # 1-1) at pdf pp. 95-98.

8

Debtor's] FanDuel account, the sparse liquid assets currently in existence, and the limited equity in the marital home, a spousal support award is necessary to ensure Plaintiff Mom and the minor children maintain a modest living commensurate with [the Debtor's] lifestyle. The primary purpose underlying an award of spousal support is to balance the incomes and needs of the parties in such a fashion whereby neither party is impoverished.[20]

Then, specifically with respect to the "gross" spousal support component of the spousal support award, the State Court stated that it was "essential as an element of the spousal award to ensure Plaintiff Mom and the minor children are able to subsist in a fashion akin to [the Debtor,]" and that "[t]he monetary amount is crucial to Plaintiff Mom and the minor children's maintenance and support and shall be paid in intervals."[21]

With respect to the $67,328.13 attorney fee obligation the State Court imposed on the Debtor, the State Court stated:

The Court's award of attorney fees and costs is not only justified, but it is conservative given [the Debtor's] shenanigans throughout these proceedings. As such, the Court awards a total of $67,328.13 in attorney fees and costs to Plaintiff Mom. . . . [S]hould [the Debtor] proceed with the threatened bankruptcy petition, it is this Court's intention to preclude the discharge of **those debts the Court believes are central to the future maintenance and support of Plaintiff Mom and the minor children, including the award of attorney fees and costs.**[22]

**D.  The State Court's findings about the Debtor's income and earning potential**

The State Court's findings that are recounted in this Part IV.D of this Opinion are relevant to the discussion of the "excessiveness issue" in Part V.C below.

---

[20] *Id.* at pdf pp. 95-96 (bold in original) (footnote omitted) (citations omitted).

[21] *Id.* at pdf p. 98.

[22] *Id.* at pdf p. 113 (bold added).

In considering the amount of child support that the Debtor would be required to pay, the State Court considered the relative earnings, and the relative earning potentials, of the Debtor and the Plaintiff. In doing so, the State Court imputed income to each of the parties. The Plaintiff's imputed income was $47,500 per year, while the Debtor's imputed income was much higher — $225,000 per year.[23] The State Court Opinion explained in great detail the basis for imputing these income amounts to the parties.[24] And the State Court found that "there is a huge disparity in the parties' earning potential."[25]

In imputing an income of $225,000 per year for the Debtor, the State Court found, as required by Michigan law for imputing income, that the Debtor had "'an actual ability and likelihood of earning the imputed income.'"[26] At one point, the State Court Opinion summarized the income finding, in part, this way:

> Based on [the Debtor's] sixteen years of employment as a practicing attorney performing legal work in a litany of fields, the apparent availability for legal work through his affiliation with New Start Legal Group, the information relative to the prevailing salaries of attorneys in Michigan, the questionable circumstances surrounding [the Debtor's] purported lack of significant earnings, the incongruity between [the Debtor's] claimed limited finances and his current lifestyle, and [the Debtor's] refusal to diligently seek out compensation akin to his prior earnings, the Court finds [the Debtor's] income should be imputed at $225,000.[27]

---

[23]  *See* JOD (Docket # 1-2) at pdf p. 9, § IV.A.1; State Court Opinion (Docket # 1-1) at pdf pp. 90, 93, 95.

[24]  *See* State Court Opinion (Docket # 1-1) at pdf pp. 88-94.

[25]  *Id.* at pdf p. 73.

[26]  *See id.* at pdf pp. 88-89 (citations omitted) (citing Michigan law standard and factors for imputing income).

[27]  *Id.* at pdf p. 93.

10

In addition, the State Court found, among other things, the following:

- "[T]he Court is of the firm belief [the Debtor] has purposely sought to remain underemployed."[28]

- "Most troubling, however, is [the Debtor's] repeated statements that he can manipulate his earnings on paper to reflect a lower earning potential for calculating support."[29]

- The Debtor's "lifestyle is not akin to one who is earning at his reduced wages. . . . [The Debtor] repeatedly stated the dinners out and entertainment were paid for by the generosity of friends—friends he at times refused to identify pleading the Fifth. [The Debtor's] continued level of discretionary spending also does not comport with one living on a limited means."[30]

- "[I]t appears [the Debtor] is merely awaiting closure of the divorce proceedings to cement his employment status."[31]

- "During trial, [the Debtor] testified 'I find money for everything that's needed[.]'"[32]

- "The Court further questions whether [the Debtor] has been forthcoming with respect to all of his income."[33]

- "[P]rior to the filing of the divorce complaint, cash was readily available. . . . [T]he parties at all times had access to significant funds for their lavish vacations and comfortable lifestyle. The filing of the divorce was the impetus for the cashflow ceasing as evidenced by the vacations and significant expenditure of cash throughout the pandemic, including the scheduling of yet another expensive vacation out west at or about the time the complaint was filed."[34]

- "Although [the Debtor] indicated funds were scarce on multiple occasions, he likewise

---

[28] *Id.* at pdf p. 90.

[29] *Id.* at pdf p. 91.

[30] *Id.*

[31] *Id.* at pdf p. 93.

[32] *Id.*

[33] *Id.*

[34] *Id.* at pdf p. 94.

11

expended thousands of dollars on sports memorabilia, dining out, and bottles of wine exceeding $100 per bottle. [The Debtor's] proclamations were at variance with the lifestyle the parties enjoyed. Furthermore, when questioned regarding his resource for various expenses, [the Debtor] grew defensive and confrontational."[35]

The State Court Opinion concluded its discussion of imputed income as follows:

> [W]hen questioned regarding his ability to procure the marijuana he smokes on an almost daily basis and the expense of the same, [the Debtor] testified, "I have a deal with people, and I get marijuana. I don't have to pay for it." Based on the Court's observations, [the Debtor] has a number of "deals" which provide financial assistance, many of which he refused to testify about pleading the Fifth. When merely questioned who paid for dinners out with the children during the pendency of the divorce, [the Debtor] stated, "I plead the Fifth. I'm not answering the question." In conjunction with the testimony regarding his regular supply of marijuana, [the Debtor] spoke of his relationship with Avi Zallen who not only owns a testing lab and marijuana dispensary, but for whom [the Debtor] admits to having provided legal work in the past. In contemplation of the evidence before the Court, and in particular [the Debtor's] lack of credibility, the Court finds an imputation of income at $225,000 is reasonable and appropriate.[36]

## V. Discussion

### A. Legal principles regarding the concept of a "domestic support obligation"

#### 1. The statutory definition, and the Debtor's admission that part of the debt at issue is a domestic support obligation

As noted in Part I of this Opinion, above, a debt that is a "domestic support obligation" is not dischargeable in bankruptcy. That term is defined in § 101(14A) of the Bankruptcy Code, as follows (with the key provisions in bold below):

> The term "domestic support obligation" means **a debt that accrues before, on, or after the date of the order for relief** in a

---

[35] *Id.*

[36] *Id.* at pdf pp. 94-95.

12

case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is—

(A) **owed to or recoverable by**—

(i) **a** spouse, **former spouse**, or child of the debtor or such child's parent, legal guardian, or responsible relative; or

(ii) a governmental unit;

(B) **in the nature of alimony, maintenance, or support** (including assistance provided by a governmental unit) **of such** spouse, **former spouse, or child of the debtor** or such child's parent, **without regard to whether such debt is expressly so designated;**

(C) **established** or subject to establishment before, on, or after the date of the order for relief in a case under this title, **by reason of applicable provisions of**—

(i) **a** separation agreement, **divorce decree,** or property settlement agreement;

(ii) an order of a court of record; or

(iii) a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and

(D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.

11 U.S.C. § 101(14A) (emphasis added).

It is undisputed that the entire debt at issue in this case is "owed to" and "recoverable by" a "former spouse," of the Debtor — *i.e.*, the Plaintiff — and was "established" by a "divorce decree." And no part of the debt has been assigned by the Plaintiff to anyone. The issue remaining is whether, and to what extent, the debt is "in the nature of alimony, maintenance, or

13

support" of the former spouse (the Plaintiff) or the children.

During the hearing on the Motion, the Debtor correctly conceded that two components of his debt to the Plaintiff under the JOD are domestic support obligations — namely, the child support payments of $1,430.00 per month, and the spousal support payments of $3,300.00 per month. The Debtor therefore has admitted that these payment obligations are "in the nature of alimony, maintenance or support" of the Plaintiff and her children, and the Court so finds. But the Debtor disputes that any of the other components of his debt under the JOD are domestic support obligations.

### 2. Additional applicable legal principles

As this Court has noted in a previous opinion, in deciding whether a debt is a domestic support obligation (sometimes referred to as a "DSO"),

> the Court is mindful that "'unlike the other nondischargeability provisions under [11 U.S.C.] § 523(a) which are construed narrowly, the nondischargeability provision of § 523(a)(5) is given a broad construction so as to promote the Congressional policy that favors enforcement of obligations for spousal and child support.'" *Andrus v. Ajemian (In re Andrus)*, 338 B.R. 746, 752 (Bankr. E.D. Mich. 2006) (quoting *Luman v. Luman (In re Luman)*, 238 B.R. 697, 704 (Bankr. N.D. Ohio 1999)); *see also Norbut v. Norbut (In re Norbut)*, 387 B.R. 199, 210 (Bankr. S.D. Ohio 2008) (same).

*Hauk v. Valdivia (In re Valdivia)*, 617 B.R. 278, 282 (Bankr. E.D. Mich. 2020), *aff'd.*, No. 20-12076, 2021 WL 1940488 (E.D. Mich. May 13, 2021); *see also Bailey v. Bailey (In re Bailey)*, 254 B.R. 901, 905 (B.A.P. 6th Cir. 2000) ("[T]he terms 'alimony' and 'support' are given a broad construction to promote the Congressional policy that favors enforcement of obligations for spousal and child support.") (citation omitted)).

This Court reiterates the following, from one of its prior opinions:

14

Typically, the task of determining whether a debt is in the nature of support is to distinguish between support obligations on the one hand, and obligations that are "in actuality a division of marital property," on the other hand. *See Sorah v. Sorah* (*In re Sorah*), 163 F.3d 397, 400 (6th Cir.1998). But necessarily under the DSO definition, there can be such a thing as a debt "established . . . by reason of . . . a property settlement agreement" that also is "in the nature of . . . support." *See* 11 U.S.C. §§ 101(14A)(B) and 101(14A)(C)(i).

> Determining if an obligation is in the nature of support in bankruptcy is a federal question. *Long v. Calhoun* (*In re Calhoun*), 715 F.2d 1103, 1107 (6th Cir.1983) (citations omitted). "When a court determin[es] what constitutes debt "in the nature of alimony, maintenance, or support" under § 101(14A), the case law construing pre-BAPCPA § 523(a)(5), which utilized the same language, is relevant.'" *In re Palmieri*, [N]o. 11-51224, 2011 WL 6812336, at *4 (Bankr. E.D. Mich. Nov. 21, 2011) (quoting *In re Boller*, 393 B.R. 569, 574 (Bankr. E.D. Tenn.2008)).

*In re Larson-Asplund*, 519 B.R. 682, 688 (Bankr. E.D. Mich. 2014).

*Schubiner v. Zolman* (*In re Schubiner*), 590 B.R. 362, 392 (Bankr. E.D. Mich. 2018).

In the *Schubiner* case just quoted, this Court described the applicable cases decided by the

Sixth Circuit Court of Appeals. The Court reiterates and will repeat that discussion here:

> In the Sixth Circuit, the case law on this issue is rather complicated. The issue generally is governed by three decisions of the United States Court of Appeals for the Sixth Circuit. These cases all were decided before the 2005 amendments to the Bankruptcy Code (commonly called "BAPCPA"). The three Sixth Circuit cases are *Long v. Calhoun* (*In re Calhoun*), 715 F.2d 1103 (6th Cir.1983); *Fitzgerald v. Fitzgerald* (*In re Fitzgerald*), 9 F.3d 517 (6th Cir.1993); and *Sorah v. Sorah* (*In re Sorah*), 163 F.3d 397 (6th Cir.1998). . . . .

15

The first of these cases, *Calhoun*, was decided in 1983.  It involved a separation agreement, later incorporated into a divorce decree, in which the bankruptcy debtor had agreed to assume five loan obligations that had been jointly incurred during the marriage, and to hold his wife harmless for their payment.  As the court described it, the separation agreement "characterizes this assumption as alimony and support although it is found in the section of the document labeled Division of Property.  Another section labeled Alimony states that there shall be no alimony other than that provided in the debts and obligations section."  715 F.2d at 1105.

The second of the Sixth Circuit cases, *Fitzgerald*, was decided in 1993.  It involved an agreed divorce judgment that had obligated the bankruptcy debtor to pay $1,500 per month in "alimony" to his former spouse, which was "not to be reduced in the event [the former spouse] became gainfully employed, but [which was] to terminate upon her death or remarriage."  9 F.3d at 518.  Among other things, the divorce judgment also divided the marital property between the parties, required the debtor to pay all marital debts, and required the debtor to pay his former spouse a lump sum of $14,000 within one year.  *Id.*  Although the divorce judgment also required the debtor to name his former spouse "the irrevocable beneficiary of a life insurance policy," *id.*, the dischargeability of that life insurance obligation was not at issue and was not discussed in *Fitzgerald*.  The only issue in *Fitzgerald* was whether the debtor's obligation to pay $1,500.00 per month in "alimony" payments was "actually in the nature of alimony, maintenance, or support," and, therefore, nondischargeable under the pre-BAPCPA version of Bankruptcy Code § 523(a)(5)(B).  And in *Fitzgerald*, the parties both testified that they intended that the obligation "was for support."  *Id.* at 519.

The third of the Sixth Circuit cases, *Sorah*, was decided in 1998.  In that case, the bankruptcy debtor was obligated by a divorce judgment to make monthly payments of $750.00 to his ex-spouse.  The divorce judgment labeled this payment obligation as "maintenance," and provided that it would cease upon the ex-spouse's "death, remarriage or 62nd birthday, whichever occurs first."  163 F.3d at 399.  The issue was whether the debtor's monthly payment obligation was "actually in the nature of alimony, maintenance, or support," and, therefore, nondischargeable under the pre-BAPCPA version of Bankruptcy Code § 523(a)(5)(B).

16

The holdings of the *Calhoun*, *Fitzgerald*, and *Sorah* cases, and the development of the law that they represent, were summarized well by another judge of this district in the case of *Goans v. Goans* (*In re Goans*), 271 B.R. 528 (Bankr. E.D. Mich. 2001):

In *Long v. Calhoun* (*In re Calhoun*),715 F.2d 1103 (6th Cir.1983), the Sixth Circuit established a four-step analysis for determining when an obligation, which is not specifically designated as alimony or maintenance, is nonetheless in the nature of support and thus nondischargeable. First, the obligation constitutes support only if the state court or parties intended to create a support obligation. Second, the obligation must have the actual effect of providing necessary support. Third, if the first two conditions are satisfied, the court must determine if the obligation is so excessive as to be unreasonable under traditional concepts of support. Fourth, if the amount is unreasonable, the obligation is dischargeable to the extent necessary to serve the purposes of federal bankruptcy law. *Calhoun*, 715 F.2d at 1109-10; *Singer v. Singer* (*In re Singer*), 787 F.2d 1033, 1036 (6th Cir.1986).

In *Fitzgerald v. Fitzgerald* (*In re Fitzgerald*), 9 F.3d 517 (6th Cir.1993), the Sixth Circuit revisited the issue of nondischargeability under § 523(a)(5) and, recognizing that *Calhoun* had been applied more broadly than intended, stated that the second element of the four-part test of *Calhoun*, commonly referred to as the "present needs" test, did not apply in situations where the obligation at issue was specifically denominated as alimony and intended by the state court or the parties as such. *Id*. at 520-521. *See also Chism v. Chism* (*In re Chism*), 169 B.R. 163, 168 (Bankr.W.D.Tenn.1994); *Pinkstaff v.Pinkstaff* (*In re Pinkstaff*), 163 B.R. 504, 507 (Bankr. N.D.Ohio 1994). The court in [*Binder*] *v. Prager* (*In re Prager*), 181 B.R. 917 (Bankr.W.D.Tenn. 1995), interpreted *Fitzgerald* as follows:

In *Fitzgerald*, the Sixth Circuit revisited its holding in *Calhoun* and in essence admonished that the *Calhoun* analysis is only to be applied in instances where the nature of an obligation under a divorce decree or marital dissolution agreement is unclear; however, where an obligation is labeled as alimony, maintenance, or support and the parties intended to create a support obligation, the bankruptcy court's inquiry should end.

*Prager*, 181 B.R. at 920. *See also Silverstein v. Glazer* (*In re Silverstein*), 186 B.R.85, 87 (Bankr.W.D.Tenn.1995) (No need to apply the four step analysis of *Calhoun* because obligation has been clearly designated by the parties as child support.).

More recently, in *Sorah v. Sorah* (*In re Sorah*), 163 F.3d 397 (6th Cir.1998), the Sixth Circuit reiterated that when a state court specifically labels an obligation as support, and the obligation has all the indicia of support, the obligation should be conclusively presumed to be a support obligation by the bankruptcy court. The court stated:

There is a saying that if something looks like a duck, walks like a duck, and quacks like a duck, then it is probably a duck. In determining whether an award is actually support, the bankruptcy court should first consider whether it "quacks" like support. Specifically, the court should look to the traditional state law indicia that are consistent with a support obligation. These include, but are not necessarily limited to, (1) a label such as alimony, support, or maintenance in

18

the decree or agreement, (2) a direct payment to the former spouse, as opposed to the assumption of a third-party debt, and (3) payments that are contingent upon such events as death, remarriage, or eligibility for Social Security benefits.

An award that is designated as support by the state court and that has the above indicia of a support obligation (along with any others that the state support statute considers) should be conclusively presumed to be a support obligation by the bankruptcy court. A non-debtor spouse who demonstrates that these indicia are present has satisfied his or her burden of proving that the obligation constitutes support within the meaning of § 523, and is thus nondischargeable. The burden then shifts to the debtor spouse to demonstrate that although the obligation is of the type that may not be discharged in bankruptcy, its amount is unreasonable in light of the debtor spouse's financial circumstances.

*Sorah*, 163 F.3d at 401 (citation omitted).

However, if the state court has not specifically labeled an obligation as support, the bankruptcy court "must look behind the award that is made under state law and make an independent factual inquiry to determine whether the award is actually in the nature of support." *Harvey v. McClelland* (*In re McClelland*), 247 B.R. 423, 426 (Bankr.N.D.Ohio 2000). *See also Luman v. Luman* (*In re Luman*), 238 B.R. 697, 705 n. 2 (Bankr.N.D.Ohio 1999) (When the obligation is not labeled support *Calhoun* still applies.).

19

> To ascertain whether such an award is in the nature of support, the bankruptcy court must first determine whether the state court intended to create a support obligation. *Calhoun*, 715 F.2d at 1109. *See also McClelland*, 247 B.R. at 426. In determining intent, the bankruptcy court may consider any relevant factors, including: the nature of the obligation; the structure and language of the divorce decree; whether other lump sum or periodic payments were also provided; the length of the marriage; the relative earning powers of the parties; the age, health and work skills of the parties; the adequacy of support absent the obligation in question; and evidence of negotiation or other understandings as to the intended purpose of the obligations. *Calhoun*, 715 F.2d at 1108 n. 7.
>
> 271 B.R. at 532-33.

*Schubiner*, 590 B.R. at 392-95 (footnote omitted).

**B. All of the debts at issue are in the nature of support and maintenance of the Plaintiff and the minor children**.

The Court has applied the analysis required by the Sixth Circuit's decisions in *Sorah v. Sorah* (*In re Sorah*), 163 F.3d 397 (6th Cir. 1998), *Long v. Calhoun* (*In re Calhoun*), 715 F.2d 1103 (6th Cir. 1983), and *Fitztgerald v. Fitzgerald* (*In re Fitzgerald*), 9 F.3d 517 (6th Cir. 1993), all of which are described in *Schubiner*, 590 B.R. at 392-95, quoted in Part V.A of this Opinion, above. The Court concludes that all of the components of the debt at issue are in the nature of support and maintenance of the Plaintiff and the minor children. The Court will discuss the debt components in three separate groups, below.

**1. The child support, spousal support, and gross spousal support obligations all are in the nature of maintenance and support of the Plaintiff and the minor children.**

The Debtor's obligations to pay the monthly child support, spousal support, and gross

20

spousal support amounts to the Paintiff are each labeled as "support" in the JOD.

The Debtor's monthly payment obligation to the Plaintiff of $1,430.00 is contained in Section IV of the JOD, labeled **CHILD SUPPORT FOR THE MINOR CHILDREN.**"[37]  The Debtor's monthly payment obligations to the Plaintiff of $3,300.00 and $1,390.65 are both contained in Section V of the JOD, labeled "**SPOUSAL SUPPORT**."[38]  The $3,300.00 obligation is contained in paragraph A of Section V, labeled "**Periodic Modifiable Spousal Support Awarded to Plaintiff Mother**," and the $1,390.65 obligation is in paragraph B of Section V, labeled "**Additional Gross Spousal Support Awarded to Plaintiff**."[39]

As noted in Part V.A of this Opinion, the Debtor has admitted that the child support payments of $1,430.00 per month, and the spousal support payments of $3,300.00 per month, are "in the nature of alimony, maintenance, or support" and the Court finds this to be correct for the reasons stated below.  But the Debtor argues that the gross spousal obligation of $1,390.65 is not "in the nature of alimony, maintenance or support."  The Court disagrees.

Under *Sorah*, bankruptcy courts must "give proper deference to state court divorce court decrees" and must not "second-guess" state court determinations regarding alimony, maintenance and support awards, where the state court divorce judgment has labeled an award as alimony, maintenance, or support, and the state court has expressed on intent to create an alimony, maintenance, or support award.  *See Sorah*, 163 F.3d at 401-02 (relying on *Fitzgerald*, 9 F.3d at 521); *see also Binder v. Prager* (*In re Prager*), 181 B.R. 917, 920 (Bankr. W.D. Tenn.1995)

_____

[37]  JOD (Docket # 1-2) at pdf pp. 9-10 (capitalization, bold, and underlining in original).

[38]  *Id.* at pdf pp. 10-11 (capitalization, bold, and underlining in original).

[39]  *Id.* (bold and underlining in original).

21

(interpreting *Fitzgerald,* 9 F.3d at 521, to mean that "where an obligation is labeled as alimony, maintenance, or support and the parties intended to create a support obligation, the bankruptcy court's inquiry should end").  Under *Sorah*, where an award is labeled as support, and the award has traditional state law indicia of support including those listed in *Sorah,* a conclusive presumption arises that the award is, in fact, support.  In *Sorah*, the Sixth Circuit Court of Appeals explained that

> [a]n award that is designated as support by the state court and that has the . . . [traditional state law] indicia of a support obligation ["includ[ing], but not necessarily limited to, (1) a label such as alimony, support, or maintenance in the decree or agreement, (2) a direct payment to the former spouse, as opposed to the assumption of a third-party debt, and (3) payments that are contingent upon such events as death, remarriage, or eligibility for Social Security benefits,"] (along with any others that the state support statutue considers) should be conclusively presumed to be a support obligation by the bankruptcy court.  A non-debtor spouse who demonstrates that these indicia are present has satisfied his or her burden of proving that the obligation constitutes support within the meaning of § 523, and is thus nondischargeable.

*Sorah*, 163 F.3d at 401 (citing *Calhoun*, 715 F.2d at 1111).

But *Sorah* does not require that all three indicia of support be present in order to find that an obligation in a judgment of divorce is in the nature of alimony, maintenance, or support.  If the obligation is labeled as support, and if sufficient other state law indicia of support exist evidencing an intent to create a support obligation, a court can find that the obligation is a domestic support obligation under the *Sorah* analysis.  *See Hauk v. Valdivia* (*In re Valdivia*), 615 B.R. 231, 238 (Bankr. E.D. Mich. 2020).  The absence of one or more of the indicia listed in *Sorah* simply means that a conclusive presumption that the obligation is support does not arise, and "the bankruptcy court 'must look behind the award that is made under state law and make an

independent factual inquiry to determine whether the award is actually in the nature of support.'" *Schubiner*, 590 B.R. at 395 (citations omitted); *see also Andrus v. Ajemian* (*In re Andrus),* 338 B.R. 746, 754 (Bankr. E.D. Mich. 2006) (citations omitted) ("Because all three of the *Sorah* factors are not present in this case, the Court cannot conclusively presume that the Debtor and [the non-debtor spouse] intended to create an award of support. However, the Court may resort to other indicia as the three factors in *Sorah* are not exclusive.").

As noted above, the first three components of the Plaintiff's Claim 6-3 (the child support, spousal support, and gross spousal support obligations) each were expressly labeled as "support" in the JOD and in the State Court Opinion on which the JOD was based. Also, as explained in Part IV.C of this Opinion, it is clear from the JOD, which incorporated the extensive findings in the State Court Opinion, that, with regard to each of these three components of the debt listed in the Plaintiff's proof of claim, the State Court intended to create a debt "in the nature of alimony, maintenance, or support;" *i.e.*, that the State Court intended to create a "domestic support obligation" within the meaning of 11 U.S.C. § 523(a)(5). Finally, the child support, spousal support, and gross spousal support obligations each bore two of the traditional state law indicia of support listed in *Sorah*; namely, that the support payments were labeled as such under the JOD (the first indicia), and that the support was structured so that payment would go directly to the Plaintiff (the second indicia).

It is true that the third *Sorah* indicia arguably may not be present with respect to the child support, spousal support, and gross spousal support obligations. That indicia is that "payments . . . are contingent upon such events as death, remarriage, or eligibility for Social Security benefits." But that does not undermine this Court's conclusion that the child support, spousal

support, and gross spousal support were for the support and maintenance of the Plaintiff and the minor children. As discussed in Part IV.C of this Opinion, the support nature of these payments is clearly shown by the overwhelming evidence of the State Court's intent to create a support obligation, and the State Court's findings that the payments were necessary for the support and maintenance of the Plaintiff and the children, with regard to each of these debts.

Moreover, within this third *Sorah* indicia there is not an exclusive list of contingencies. Rather, as quoted above, the Sixth Circuit stated this third indicia as "payments that are contingent upon **such events as** death, remarriage, or eligibility for Social Security benefits." (Emphasis added). That formulation does not necessarily exclude within its coverage payments that are specifically time-limited, as each of the payments labeled "support" are in this case. Each of these three "support" components in the JOD is to be paid by the Debtor only for and within a specified time frame. As described in footnote 14 of this Opinion, the monthly child support payments are to be made only until the children reach the age of 18, or if still in high school, up to the age of 19 years and six months. The monthly spousal support payments are to be made only for 7.5 years (90 months), or "until further order of the [State] Court." *See* footnote 14 of this Opinion. And the Debtor has conceded that these two debt components are domestic support obligations. The third debt component labeled as support, the monthly payment amount labeled as "Additional Gross Spousal Support Awarded to Plaintiff" in the JOD, which is in dispute, is also time limited, in that it is structured to be paid over a period of 6.3 years (76 months). *See* footnote 14 of this Opinion.[40]

---

[40] Under the JOD, this payment obligation of $1,390.65 per month continues only until the Debtor has paid a total of $105,750.33. *See* footnote 14 of this Opinion. That equates to a total payment period of 76 months (6.3 years).

Given these time limits, it is not surprising that the JOD does not make the support payments contingent on "such events as death, remarriage, or eligibility for Social Security benefits." *Cf. Bailey v. Bailey* (*In re Bailey*), 254 B.R. 901, 905 (B.A.P. 6th Cir. 2000) (third *Sorah* indicia not applicable to debt that was "a current obligation").

Furthermore, with regard to the "Additional Gross Spousal Support Awarded to Plaintiff" in the JOD, the fact that it was found in the same Section of the JOD as the other awards, which are clearly and admittedly "support" obligations, is indicia that the State Court meant that award to be a "support" obligation also. The support nature of this part of the JOD debt is further shown by the following facts.

A large portion of this "gross spousal support" was based on past due amounts that the Debtor had been required to pay for the support and maintenance of the Plaintiff and the parties' children, and for amounts that had already been paid by the maternal grandmother for the support and maintenance of the parties' children. Under the JOD, the Plaintiff was awarded, as additional gross spousal support, $1,390.65 per month until the Debtor paid total of $105,750.33. This amount ($105,750.33) was comprised of "past due status quo obligations as of January 30, 2023 of $34,314.00 and the amount awarded to Plaintiff in the [State Court] Opinion of $71,436.33[.]"[41] The $71,436.33 portion of the total $105,750.33 awarded was, in part, comprised of "the $33,732.63 outstanding debt owed to the maternal grandmother expended for the needs, care, and support of Plaintiff Mom and the minor children during the pendency of the divorce proceedings."[42] And with regard to the remaining gross spousal support award of

---

[41] JOD (Docket # 1-2) at pdf p. 11, ¶ V.B.

[42] State Court Opinion (Docket # 1-1) at pdf p. 97.

$37,703.70, the State Court found that it was "essential as an element of the spousal award to ensure Plaintiff Mom and the minor children are able to subsist in a fashion akin to Defendant," and that it was "crucial to Plaintiff Mom and the minor children's maintenance and support[.]"[43]

An additional indicia of support is that under Michigan law, relief labeled as "spousal support" need not be awarded to a spouse if, considering all the circumstances, "the estate and effects awarded to" that spouse are sufficient "for the suitable support and maintenance of" that spouse. *See* Mich. Comp. Laws Ann. § 552.23(1). Given this statute, the fact that spousal support was awarded to the Plaintiff is also indicia that all of the awards labeled as "support" actually are in the nature of support and maintenance of the Plaintiff and the minor children.

Under *Sorah*, other indicia of support can include the following "'(1) the disparity of earning power between the parties; (2) the need for economic support and stability; (3) the presence of minor children; and (4) marital fault.'" *Bailey*, 254 B.R. at 906 (quoting *Luman v. Luman* (*In re Luman*), 238 B.R. 697, 706 (Bankr. N.D. Ohio 1999) (citing *Singer v. Singer* (*In re Singer*), 787 F.2d 1033, 1035 (6th Cir.1986)); *see also Bailey v. Bailey* (*In re Bailey*), No. 23-8001, 2014 WL 1511984, at *13 (B.A.P. 6th Cir. April 8, 2024).

In this case, the State Court found that there was a significant disparity in the greater earning power of the Debtor compared to that of the Plaintiff; the need for economic support and stability of the Plaintiff and the children; and the presence of three minor children. *See* discussion in Parts IV.C and IV.D of this Opinion. And the State Court also found numerous instances that can be described as "marital fault" on the part of the Debtor, although it also found

---

[43] *Id.* at pdf p. 98.

some such fault on the part of the Plaintiff.[44]

For all of these reasons, the Court must conclude that each of the three components in the JOD that were labeled as "support" are actually in the nature of support and maintenance of the Plaintiff and the minor children.

**2. The $98,001.56 Property Award obligation is in the nature of maintenance and support of the Plaintiff and the minor children**.

The debt that is listed as the "Property Award" in the amount of $98,001.56 in the Plaintiff's Claim 6-3 is contained in Section VIII of the JOD, labeled **"PROPERTY DIVISION."**[45]  Under this section of the JOD, the property that the Plaintiff was awarded includes the following:

> 1.  The real property located at 4079 Waterwheel Lane, Bloomfield Township, MI 48302 and all interest, equity, and contents therein. . . .
>
> 2.  The property award payable by Defendant to Plaintiff in the sum of $98,001.56 within 90 days.  This sum accounts for the following:
>
>    •  One-half of the awarded value of dissipated life insurance check by Defendant of $37,703.70 (with the other half awarded to Plaintiff in gross spousal support award above); and
>
>    •  Plaintiff portion awarded for the dissipated assets of $90,0000; and
>
>    •  2019 Tax Liability of $3,297.86
>
>    •  Less Plaintiff share of the children's school debt

---

[44]  *See, e.g.*, State Court Opinion (Docket # 1-1) at pdf p. 2 n.1; pdf pp. 3-4, pdf p. 4 n.3; pdf p. 8 n.6; pdf p. 26; pdf pp. 32-33, 35; pdf pp. 62-66.

[45]  JOD (Docket # 1-2) at pdf pp.13-14 (bold and underlining in original).

27

as referenced below of $33,000.[46]

The property awarded to the Plaintiff in paragraph 2 above is the basis for the "Property Award" debt amount listed in the Plaintiff's POC. Because the "Property Award" is not specifically labeled as support in the JOD, the Court must make an independent factual inquiry to determine if the State Court intended for the property in paragraph 2 to be a true property settlement, or alternatively, whether the State Court intended it to be "in the nature of alimony maintenance or support" of the Plaintiff and the minor children.

> An obligation not labeled as support nevertheless may fall within the definition of domestic support obligation. *See Long v. Calhoun* (*In re Calhoun*), 715 F.2d 1103, 1107 (6th Cir. 1983) (enunciating a four-part analysis for determining whether an award that is not specifically designated as alimony, maintenance, or support (under the pre-BAPCPA version of the Code) was actually in the nature of support and, therefore, nondischargeable under § 523(a)). The Sixth Circuit Bankruptcy Appellate Panel reiterated the required analysis in *In re Thomas*, 511 B.R. 89, 95 (B.A.P. 6th Cir. 2014), *aff'd*, 591 F. App'x 443 (6th Cir. 2015) (quoting *Fitzgerald v. Fitzgerald* (*In re Fitzgerald*), 9 F.3d 517, 520 (6th Cir. 1993) (citing *Calhoun*, 715 F.2d at 1109–10)):
>
>> First, the obligation constitutes support only if the state court or parties intended to create a support obligation. Second, the obligation must have the actual effect of providing necessary support. Third, if the first two conditions are satisfied, the court must determine if the obligation is so excessive as to be unreasonable under traditional concepts of support. Fourth, if the amount is unreasonable, the obligation is dischargeable to the extent necessary to serve the purposes of federal bankruptcy law.
>
> *Bailey v. Bailey* (*In re Bailey*), No. 23-8001, 2024 WL 1511984, at *11 (B.A.P. 6th Cir. Apr. 8, 2024) (footnote omitted)).

---

[46] *Id.*

Each of the sums that make up the property awarded under paragraph 2 in the "Property Division" part of the JOD, quoted above, is lacking two of the three indicia of support listed in *Sorah.* None of these payment amounts is explicitly labeled as alimony, maintenance, or support (the first indicia); and none of them are "contingent upon such events as death, remarriage, or eligibility for Social Security benefits" (the third indicia). In general, but not in this case, the absence of these indicia might indicate a property settlement, rather than support. *See, e.g., Andrus v. Ajemian* (*In re Andrus*)*,* 338 B.R. 746, 754 (Bankr. E.D. Mich. 2006).

The JOD does provide for a direct payment to the Plaintiff as opposed to the assumption of a third-party debt (the second indicia), with regard to at least the $37,703.70, and $90,000.00 portions of the awards in paragraph 2. Only the $3,297.86 portion of the property award under paragraph 2 requires the Debtor to assume the 2017 tax liability and hold the Plaintiff harmless for such obligation.

Despite missing some of the indicia of support listed in *Sorah*, there is sufficient other indicia of support in the JOD and the State Court Opinion to establish that the State Court intended all of these obligations designated as a "Property Award" to be "in the nature of alimony, maintenance, or support."

First, as noted in Part IV.C of this Opinion, Section XII of the JOD, entitled "**MISCELLANEOUS PROVISIONS**" contains paragraph M, entitled "**Non-Dischargeability of Court Ordered Obligations**," which unambiguously expresses the State Court's intent that "[t]he award to each party under [the JOD] is assumed to be a domestic obligation that is not dischargeable under the Bankruptcy Code 11 USC [§] 523(a)(5)."[47] This sentence clearly

---

[47] JOD (Docket # 1-2) at pdf p. 20.

expresses the State Court's intent that, regardless of in where in the JOD an award is found, and regardless of how an award is labeled, each and every award, including the award under the "Property Division" section of the JOD, is "in the nature of alimony, maintenance or support." And Paragraph M even states: "All monies each respective party may owe the other pursuant to **the property settlement** and hold harmless provisions of this [JOD] shall likewise be non-dischargeable in bankruptcy."[48]

Such blanket statements in Paragraph M by the State Court, standing alone, would not necessarily be sufficient for the Court to find that the Property Award under paragraph 2 is a "support" obligation. In one bankruptcy case from this district, the court did not view a statement like this as probative. *See Andrus,* 338 B.R. at 753-56 (reasoning that on the facts in that case, similar language in a divorce judgment did not "tend to show the [d]ebtor's obligations to be either more or less in the nature of alimony or support"). But this Court views such language in the JOD as relevant evidence, tending to show that the Property Award and other debt obligations of the Debtor to the Plaintiff are in the nature of support.

In this case, there is much more than just the blanket statements in paragraph M to show that the State Court intended the Property Award as in the nature of "alimony, maintenance or support."

The reasoning of the State Court in making the "Property Award," and in intending it to be in the nature of "alimony, maintenance or support," is that there were "sparse liquid assets currently in existence," and "limited equity in the marital home," and as a result, there were few assets to divide between the parties, because the Debtor had dissipated most of the marital

---

[48] *Id.* (emphasis added).

assets.[49]  There were so few marital assets remaining due to the Debtor's wrongful conduct, that the State Court even found that it was necessary to invade the Debtor's separate property and award it to the Plaintiff, in order to provide necessary maintenance and support for the Plaintiff and the minor children.  The Debtor's separate property included a $75,407.40 inheritance, in the form of a life insurance benefit that the Debtor received while the divorce case was pending, then dissipated, and then only later disclosed.  The State Court explained that it had the statutory authority to invade the separate property of the Debtor, *because it was necessary to do so to provide support for the Plaintiff and the minor children*:

> First and foremost, the [State] Court is called upon to decipher what is separate property versus what is marital property. *Reeves v Reeves*, [575 N.W.2d 1, 3,] 226 Mich[. Ct.] App[.] 490, 493-494 (1997). Marital property includes property that was acquired or earned during the course of the marriage, whereas separate property is typically that which was obtained or earned before the marriage. *Cunningham v. Cunningham*, [795 N.W.2d 826, 830,] 289 Mich[. Ct.] App[.] 195, 210 (2010). Absent a scenario where one spouse significantly contributed to the acquisition, improvement or accumulation of separate property, or **a scenario where invasion of the separate property is appropriate for the support of the other spouse**, the court's authority to invade separate assets is curtailed by statutory authority.  *See* [Mich. Comp. Laws §] 552.401 and [Mich. Comp. Laws §] 522.23.[50] In other words, absent limited circumstances,

---

[49]  *See* State Court Opinion (Docket # 1-1) at pdf pp. 72-73, 96.

[50]  Mich. Comp. Laws § 552.23(1) states:

> (1) **Upon entry of a judgment of divorce** or separate maintenance, **if the estate and effects awarded to either party are insufficient for the suitable support and maintenance of either party and any children of the marriage who are committed to the care and custody of either party**, the court may also award to either party the part of the real and personal estate of either party and **spousal support** out of the real and personal estate, **to be paid to either party in gross or otherwise** as the court considers just and reasonable, after considering the ability of either

31

each party will walk away with their separate assets without invasion by the other. *Reeves,* [575 N.W.2d at 3, 226 Mich. Ct. App.] at 494. . . . .

Notwithstanding the general presumption that income earned during the duration of the marriage is deemed marital property, some property earned or acquired during the marriage may be categorized as separate property. *See Cunningham*, [795 N.W.2d at 830, 289 Mich. Ct. App.] at 201 (citing *Byington*, 568 N.W.2d at 146-47, 224 Mich. Ct. App.] at 112). For instance, an inheritance received by one spouse during the marriage, provided it is kept separately maintained from the marital property, generally is classified as separate property. *Dart v*[.] *Dart*, [597 N.W.2d 82, 87,] 460 Mich[.] 573, 584-585 (1999). . . . .

Pursuant to statutory authority, a court may nonetheless invade the separate assets of a party under certain circumstances. *See* [Mich. Comp. Laws §] 552.23. **Relevant to these proceedings is [Mich. Comp. Laws §] 552.23(1) which permits the invasion of separate property when following the division of the marital assets, "the estate and effects awarded to either party are insufficient for the suitable support and maintenance of either party."** *Reed* [*v.*] *Reed*, [693 N.W.2d 825, 839,] 265 Mich[. Ct.] App[.] 131, 152 (2005) (quoting *Korth*, [662 N.W.2d at 115, 256 Mich. Ct. App.] at 291). Simply stated, invasion of one's separate assets is appropriate when "one party demonstrates additional need." *Reeves*, [575 N.W.2d at 3, 226 Mich. Ct. App.] at 494. As noted extensively above, the facts and circumstances surrounding [the Debtor]'s disposition of the $75,407 inheritance were highly suspect. **The "need" component is also clearly satisfied, particularly in light of [the Debtor]'s conduct in depleting essentially all of the marital estate.** At present, the **marital estate is comprised of very limited assets**, and without question, the Court would have invaded [the Debtor]'s inheritance and included it in the distribution between the parties. **With the exception of the marital home, there are no tangible assets**

---

party to pay and the character and situation of the parties, and all the other circumstances of the case.

(Emphasis added).

**remaining**, and based on [the Debtor]'s dissipation of the marital estate, the Court finds an award in Plaintiff Mom's favor for the entire inheritance of $75,407.40 is appropriate.[51]

The State Court's many statements and its reasoning clearly show that the State Court intended the "Property Award" of $98,001.56 to be in the nature of support. And certainly the State Court Opinion and JOD show that such payment obligation by the Debtor has the actual effect of providing necessary support. This Court must conclude that it is an obligation in the nature of support.

**3. The $67,328.13 obligation for the "Debtor's Contribution to Creditor's Attorney Fees and Costs" is in the nature of maintenance and support of the Plaintiff and the minor children**.

The $67,328.13 obligation for the "Debtor's Contribution to Creditor's Attorney Fees and Costs" is contained in section XI of the JOD, entitled "**ATTORNEY/EXPERT FEES**," which states, in relevant part:

> B. Defendant shall pay to Plaintiff the sum of $67,328.13 within 90 days as his contribution towards Plaintiff's attorney fees and costs incurred up through the last day of trial. **This amount shall not be dischargeable in bankruptcy as this Court believes the obligation is *central* to the future maintenance and support of Plaintiff and the minor children.**[52]

The common meaning of "central" is "of primary importance: ESSENTIAL,

---

[51] State Court Opinion (Docket # 1-1) at pdf pp. 71-73 (emphasis added).

[52] JOD (Docket # 1-2) at pdf p. 18 (bold and italics added).

33

PRINCIPAL[,][53] or the "most important part of something[.]."[54]  Not only did the State Court expressly state in the JOD that the award of attorney fees and costs to the Plaintiff was for the "the future maintenance and support of the Plaintiff and the minor children," but the State Court further stated that such award was "central" or essential to providing such support.  In addition to calling the award "support," the State Court expressly stated that its award of attorney fees and costs to the Plaintiff was not dischargeable in bankruptcy.  This is further strong indicia that the State Court intended the award of attorney fees and costs as being in the nature of support.  And paragraph M of Section XII of the JOD, entitled "**Non-Dischargeability of Court Ordered Obligations**,"[55] clearly applies to all awards to either party under the JOD, including the award of attorney fees and costs to the Plaintiff.

The State Court's reasoning and findings in support of the award of attorney fees and costs further shows the support nature of this obligation.

The State Court noted that "in her complaint and at [the] time of trial, [the] Plaintiff Mom requested an award of attorneys fees[,] and "allege[d that such] fees were sought [under Mich. Comp. Laws § 552.13 and Michigan Court Rules 3.206(D)(2)(a) and 3.206(D)(2)(b),] not only **on the basis of need**, but as a sanction for [the Debtor's] duplicitous behavior."[56]

---

[53]  "Central." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/central. Accessed 7 Aug. 2024 (capitalization in original).

[54]  " Central."  Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/central.  Accessed 7 Aug. 2024.

[55]  *See* Part IV.C of this Opinion.

[56]  State Court Opinion (Docket # 1-1) at pdf p. 98 (emphasis added).  Mich. Comp. Laws 552.13 states:

> Sec. 13. (1) In every action brought, either for a divorce or for a

34

The State Court awarded attorney fees and costs based on both (1) a finding of need on the part of the Plaintiff, as required by Mich. Ct. R. 3.206(D)(2)(a); and (2) a finding that the Debtor's contemptuous failure to comply with orders of the State Court caused much of the billed attorney fees, as required by Mich. Ct. R. 3.206(D)(2)(b).[57] The State Court explained:

> separation, **the court may require either party to pay alimony for the suitable maintenance of the adverse party**, to pay such sums as shall be deemed proper and necessary to conserve any real or personal property owned by the parties or either of them, and **to pay any sums necessary to enable the adverse party to carry on or defend the action, during its pendency.** It may award costs against either party and award execution for the same, or it may direct such costs to be paid out of any property sequestered, or in the power of the court, or in the hands of a receiver.
>
> (2) An award of alimony may be terminated by the court as of the date the party receiving alimony remarries unless a contrary agreement is specifically stated in the judgment of divorce. Termination of an award under this subsection shall not affect alimony payments which have accrued prior to that termination.

(Emphasis added).

[57] Michigan Court Rule 3.206(D) states:

> **(D) Attorney Fees and Expenses**
>
> .
>
> (1) A party may, at any time, request that the court order the other party to pay all or part of the attorney fees and expenses related to the action or a specific proceeding, including a post-judgment proceeding.
>
> (2) A party who requests attorney fees and expenses must allege facts sufficient to show that:
>
> > (a) the party is unable to bear the expense of the action, including the expense of engaging in discovery appropriate for the matter, and that the other party is able to pay, or
> >
> > (b) the attorney fees and expenses were incurred because the other party refused to comply with a previous court order, despite having the ability to comply, or engaged in discovery practices in violation of these rules.

> Mich. Ct. R. 3.206(D)(2) provides for the award of attorney fees when one party is unable to bear the expense of the action and the other party is able to pay and/or when attorney fees are incurred as a result of a party's refusal to comply with a court's order despite having the ability to be compliant.[58]

The State Court stated, with regard to its award of attorney fees and costs to the Plaintiff:

- The State Court had "conducted not one but two show cause hearings and found [the Debtor] in contempt for the blatant violations of this Court's prior orders."[59]

- "Based on the evidence presented to this Court, the Court found [the Debtor] culpable for continued violations of the Court's orders."[60]

- "[J]ustification for an award of attorney fees in Plaintiff Mom favor is twofold. As the stay-at-home parent for the past fifteen years, Plaintiff Mom was not privy to financial resources apart from the marital assets. Although she was able to borrow funds from the maternal grandmother, **Plaintiff Mom did not have ready access to income or other resources for the payment of legal counsel**. [The Debtor], throughout the entirety of the marriage, maintained control over the parties' finances, and his testimony regarding a gift of $30,000 from his now deceased father for the initial retainer to counsel is quite frankly not believable to this Court."[61]

- "As noted in great detail above, [the Debtor] accessed and expended hundreds of thousands of dollars for his sole financial benefit and to the detriment of Plaintiff Mom. While he ensured he had a roof over his head at the hotel, in an expensive 90-day Sylvan Lake Airbnb, in a prepaid one-year lease on a Waterford rental, and most recently, in a prepaid lease on a Bloomfield Hills home, [**the Debtor] did not timely pay the court ordered $7,500 status quo amount needed for the subsistence of the marital home and related expenses**."[62]

- "Additionally, as reflected in thousands of pages of bank statements, canceled checks,

---

Mich. R. Spec. P. Mich. Ct. R. 3.206 (bold in original).

[58] State Court Opinion (Docket # 1-1) at pdf p. 98.

[59] *Id.* at pdf p. 100.

[60] *Id.*

[61] *Id.* at pdf p. 102 (emphasis added).

[62] *Id.* at pdf p. 103 (emphasis added).

36

credit card statements, FanDuel account records, and the like, [the Debtor] gambled tens of thousands of dollars, paid various large sums of money to members of the Garelick family for what the [State] Court found to be questionable reasons, purchased thousands of dollars of sports memorabilia, 'invested' in excess of $60,000 in cryptocurrency, entertained the children with birthday parties/expensive birthday gifts/dinners out/entertainment, and prepaid $48,000 for a two-year lease for his law practice. Equally disconcerting, [the Debtor] appeared before the Court in August 2021 claiming he had no money, and yet, he cashed a life insurance check for $75,407.39 on August 3, 2021. Thereafter, he proceeded to wire the funds to his FanDuel gambling account where they were depleted. **Based on the evidence presented to the [State] Court, it was clear [the Debtor] not only sought to subvert the Court's orders, but [the Debtor] likewise sought to hinder Plaintiff Mom's ability to provide for herself and the minor children when they were in her care.** Unquestionably, [the Debtor's] conduct was conniving and prompted by a desire to diminish the financial resources available to both parties. The ever escalating litigation costs in this matter stemmed from [the Debtor's] unjustified refusal to comply with the orders of this Court. [The Debtor] was fully capable of complying with this Court's directives, but he repeatedly sought to evade compliance with a litany of incredible justifications. In consequence, an award of attorney fees and costs pursuant to the Michigan Court Rules and common law is in order. *See* MCR 3.206(D)(2)(b)."[63]

It is clear from the reasoning and findings of the State Court Opinion that the State Court based its award of attorney fees and costs to the Plaintiff on the need to provide for "the suitable maintenance of the" Plaintiff and the minor children, and that the State Court awarded the Plaintiff an amount of attorney fees and costs that would enable the Plaintiff "to pay any sums necessary to enable [her] to carry on or defend the action, during its pendency." Because the State Court stated that the award of attorney fees and costs to the Plaintiff was for support of the Plaintiff and the minor children, and this award had the above listed indicia of support, and obviously had the actual effect of providing necessary support, the Court concludes that this award was "in the nature of alimony, maintenance, or support."

Based on the foregoing, the Court concludes that under the appropriate analysis required

---

[63] *Id.* at pdf pp. 103-04 (emphasis added).

by *Sorah* and the other applicable Sixth Circuit cases, there is no genuine dispute of any material fact, and Plaintiff is entitled to judgment as a matter of law, that all of the Debtor's debt to the Plaintiff at issue is in the nature of a support obligation under 11 U.S.C. §§ 101(14A), 523(a)(5), and 1328(a)(2).

**C. The excessiveness issue**

Under *Sorah*, therefore, the Debtor has a burden of demonstrating "'that although the obligation is of the type that may not be discharged in bankruptcy, its amount is unreasonable in light of the debtor spouse's financial circumstances.'" *Schubiner*, 590 B.R. at 394-95 (quoting *Sorah*, 163 F.3d at 401).

More specifically, this means, as the Sixth Circuit stated in *Sorah*, that:

> the only response available to the debtor spouse is to demonstrate that the obligation is unreasonable in light of the debtor's financial circumstances. This is the third prong of the *Calhoun* test. *See* 715 F.2d at 1110. We further note that the bankruptcy court does not sit as a super-divorce court to determine the *most* reasonable level of support. Rather, it may consider evidence that the obligation is unreasonable and discharge it *to the extent* that it exceeds what the debtor can reasonably be expected to pay. Section 523 obviously places no limitation upon a state court's ability to award alimony, maintenance, or support (*see Fitzgerald*, 9 F.3d at 521), and the bankruptcy court should not second-guess the state court support award absent evidence that the burden on the debtor spouse is excessive.

*Sorah*, 163 F.3d at 402 (italics in original). More recently, this "excessiveness" defense was described this way by the Sixth Circuit:

> When a debt is in the nature of support, the full debt is nondischargeable unless the debt "is so excessive as to be unreasonable under traditional concepts of support." The debt is only unreasonable if it "substantially exceed[s]" the debtor's present and foreseeable ability to pay at the time the debt is

assumed.

*Thomas v. Clark* (*In re Thomas*), 591 F. App'x 443, 446 (6th Cir. 2015) (citations omitted).

The Debtor seems to argue that the parts of his debt at issue are excessive. As noted in Part V.A.1 of this Opinion, above, the Debtor has conceded that the child support payments of $1,430.00 per month and the spousal support payments of $3,300.00 per month are nondischargeable domestic support obligations. The Debtor argues that the other components of his debt under the JOD are excessive. These are the additional gross spousal support payments totaling $105,750.33 (payable at the rate of $1, 390.65 per month); the $98,001.56 "Property Award;" and the $67,328.13 attorney fees and costs award.

The Court must reject the Debtor's "excessiveness" argument. For the following reasons, the Debtor's argument is precluded by the findings made by the State Court in the State Court Opinion and the JOD, which are binding on the Debtor under the doctrine of collateral estoppel.

As discussed in Part IV.D of this Opinion, the State Court found that the Debtor's imputed income was $225,000 per year, and calculated the amount of the Debtor's child support and spousal support based on that income. Based on that imputed income, and the fact that the Debtor, an attorney who was 49 years old at the time of the JOD,[64] had earned enough income previously to support a lavish lifestyle for himself and his family, and has many more years of earning potential ahead of him, it is clear that the Debtor does have the ability to pay the debt amounts at issue now and in the future. *See generally Luman v. Luman* (*In re Luman*), 238 B.R. 697, 710 (Bankr. N.D. Ohio 1999) (emphasis added) (citations omitted) (the excessiveness analysis "is normally made by inquiring into whether the debt assumption substantially exceeded

---

[64] *See* State Court Opinion (Docket # 1-1) at pdf p. 5.

39

the debtor spouse's **present and foreseeable ability to pay the support, as viewed from the time the debt was assumed**.").

In addition to the Debtor's imputed income, the State Court's Opinion questioned whether the Debtor had disclosed all of his assets and sources of income. *See* Part IV.D. of this Opinion.

Numerous findings by the State Court indicated that the Debtor had obtained hundreds of thousands of dollars in recent years, but purported to have spent nearly all of it. But the State Court also found that the Debtor had been evasive and far from transparent about where the money came from and what happened to all of the money.

For example, the State Court Opinion found that the Debtor had created several LLC entities over the years, and that one of those, Santana Investment Society LLC, had bank accounts at Comerica Bank. The State Court found that the Debtor "did not voluntarily disclose" these accounts during discovery, and the Debtor failed to provide details regarding the source of the funds in these accounts, except to say that the funds "were 'just given to us.'"[65] The State Court found that "[i]n excess of $850,000 was deposited in the Santana bank accounts, and yet, no tax returns were ever filed for the corporate entity."[66] The State Court further found that another corporate entity the Debtor created in 2019, called Matapalo Investments LLC, had been "used just to 'hold' money," as part of transferring money "back and forth to different accounts."[67] As the State Court recounted, "[w]hen pointedly questioned why he'd create a new

---

[65]  *See id.* at pdf p. 6.

[66]  *Id.*

[67]  *Id.* at pdf pp. 6-7.

40

entity in 2019 to merely transfer cash back and forth, [the Debtor] stated 'I'm going to plead the Fifth on that one.'"[68]

The State Court found that the Debtor had lost a total of $46,022.58 on gambling during the first half of 2021, and that the Debtor had invested $82,774 in cryptocurrency, but "[b]y the conclusion of trial, . . . all money 'invested' in the cryptocurrency [had] inexplicably disappeared."[69]

The State Court also found that the Debtor had made several large, unnecessary expenditures in June and July 2021, while the divorce case was pending, including a $48,000 pre-payment for a "two-year lease of office space for his Farmington Hills office," and a $25,350 pre-payment for a "one-year lease for a home" in Waterford, Michigan.[70]

The State Court also found that the Debtor received and cashed a life insurance check for $75,407.39 on August 3, 2021, "following his father's passing," but failed to disclose it.[71] And "[i]n short, between June 8, 2021 and August 3, 2021," the Debtor "unilaterally chose how to expend sums exceeding several hundreds of thousands of dollars, and it was only through discovery that this information came to light."[72]

The State Court found that the Debtor was not forthcoming or honest:

> Extensive evidence was presented at trial regarding [the Debtor's]

---

[68] *Id.* at pdf p. 7.

[69] *Id.* at pdf p. 10.

[70] *Id.* at pdf pp. 12-13.

[71] *Id.* at pdf p. 13.

[72] *Id.* (footnote omitted).

> questionable financial dealings, history of gambling, and inability to be forthcoming and honest. Indeed, throughout the pendency of this matter, [the Debtor] depleted the family's financial resources without compunction. Discovery likewise revealed a pattern of blatant and repeated lies.[73]

The State Court cited as examples of the Debtor's dishonesty misrepresentations he had made on applications for two Paycheck Protection Program (PPP) loans, totaling $247,022.93.[74] The State Court emphasized the Debtor's "lack of candor and lack of credibility" and his "continued inability or unwillingness to be truthful."[75]

Based on all of the foregoing, this Court must conclude that the Debtor cannot meet his burden of proving that the amounts the Debtor must pay under the JOD, taken together, are "unreasonable in light of the [D]ebtor's financial circumstances," or that they "exceed[] what the [D]ebtor can reasonably be expected to pay," within the meaning of the *Sorah* case, quoted above. [76]

This conclusion is bolstered by the following: (1) the broad construction that this Court must give to the domestic support obligation exception to discharge; (2) the Sixth Circuit's instructions in *Sorah* that "Section 523 obviously places no limitation upon a state court's ability to award alimony, maintenance, or support" and that generally, "the bankruptcy court should not second-guess the state court support award," *Sorah*, 163 F.3d at 402; and (3) the Sixth Circuit's

---

[73] *Id.* at pdf p. 41.

[74] *Id.* at pdf pp. 41-42.

[75] *Id.* at pdf p. 43.

[76] It is clear from the *Sorah* case that the Debtor bears the burden of proof on this issue. *See Sorah*, 163 F.3d at 401-02.

42

holding in the *Thomas* case, quoted above, that:

> the full [support] debt is nondischargeable unless the debt "is so excessive as to be unreasonable under traditional concepts of support." The debt is only unreasonable if it **"substantially exceed[s]" the debtor's present and foreseeable ability to pay at the time the debt is assumed.**

*Thomas*, 591 F. App'x at 446 (emphasis added) (citations omitted).

## D. Collateral estoppel precludes the Debtor from disputing the State Court's findings, including its findings about the Debtor's income and earning potential.

The Debtor is precluded, by the doctrine of collateral estoppel, from now disputing the findings of the State Court described in this Opinion above.

### 1. The collateral estoppel elements are met.

As this Court has previously held, the doctrine of collateral estoppel applies in nondischargeability proceedings. *See, e.g.*, *McCallum v. Pixley* (*In re Pixley*), 456 B.R. 770, 775 (Bankr. E.D. Mich. 2011). "Collateral estoppel . . . prevents a party from relitigating issues of fact or law which were necessarily decided by a previous final judgment." *Id.* (quoting *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997)).

Because the JOD in this case is a judgment of a Michigan state court, this Court must apply the Michigan law of collateral estoppel. *See Pixley*, 456 B.R. at 775-76. Under Michigan law, the following requirements must be met in order for collateral estoppel to apply:

> 1) there is identity of parties across the proceedings,
>
> 2) there was a valid, final judgment in the first proceeding,
>
> 3) the same issue was actually litigated and necessarily determined in the first proceeding, and
>
> 4) the party against whom the doctrine is asserted had a full and

43

fair opportunity to litigate the issue in the earlier proceeding.

*Pixley*, 456 B.R. at 776 (quoting *Phillips v. Weissert* (*In re Phillips*), 434 B.R. 475, 485 (B.A.P. 6th Cir. 2010) (citation omitted)).

All of these requirements are met, with respect to the State Court findings cited above. The parties are the same; the JOD is a valid, final judgment; all of the State Court findings were issues that were actually litigated and necessarily determined; and the Debtor had a full and fair opportunity to litigate the issues. As a result, the Debtor is now precluded from disputing the State Court findings. To the extent the Debtor is unhappy with those findings or with the JOD, the Debtor must seek relief from the State Court or from the Michigan Court of Appeals.

There is no dispute about the first and fourth of the collateral estoppel requirements. And the third requirement is met, because the State Court's findings and decision about the components of the Debtor's debt to the Plaintiff under the JOD were actually litigated, through extensive motion practice and 11 days of trial, and all of the State Court's findings cited and quoted in this Opinion were necessary to the State Court's decision reflected in the JOD.

As for the second collateral estoppel requirement, the Debtor argues that the JOD is not a final judgment.[77] The Plaintiff disagrees. The Court concludes that the JOD is a final judgment.

**2. The JOD is a final judgment.**

The Debtor argues that the JOD is not a final order because there are still issues to be

---

[77] Despite making this argument, the Debtor also points out that he is currently appealing the State Court's support order. The record is not entirely clear that this is so, but even if it is, collateral estoppel still applies. *See Taleb v. Kramer* (*In re Kramer*), 543 B.R. 551, 559 (Bankr. E.D. Mich. 2015) ("[T]he Court concludes that under Michigan law, a final (*i.e.*, not interlocutory) judgment has preclusive effect under the doctrine of collateral estoppel (also known as issue preclusion), even when the judgment is on appeal or the time for appeals has not yet expired.").

determined in the divorce case, including issues relating to his personal property.[78]  In support of

this argument, the Debtor relies, in part, on the following portion of the State Court Opinion,

filed January 17, 2023:

> The Court was not provided at trial with a list of the personal
> property in dispute; however, the parties submitted proposed
> findings of fact and conclusions of law in which Plaintiff Mom
> [(Jillian Clark)] requested all of the items remaining in the marital
> home and [the Debtor] [(Richard Clark)] itemized a list of various
> items (labeled A-P) which he requested be awarded to him.
> Because no valuation for the items was provided, the Court simply
> cannot allocate the personal items in dispute without additional
> insight from the parties. For example, [the Debtor] requested any
> remaining surfboards, skateboards, a Joe Montana picture, poker
> chips, tools, all Grateful Dead cassette tapes, and various camping
> gear to name but a few of the listed items. **If the parties cannot
> independently reach an agreement regarding the distribution
> of these items and/or any credit [the Debtor] is entitled to on
> his arrearage for those personal property items which were
> previously sold, counsel is directed to contact chambers for a
> further hearing date on the matter.**  With respect to [the
> Debtor]'s request for those personal items from his youth or given
> to him as gifts from his family (Gold chain from his bar mitzvah,
> batman/superman watches from childhood, wedding band, and his
> father's toolbox), these items and his remaining clothing and shoes
> shall be promptly turned over to [the Debtor].[79]

The Debtor also alleges that there were multiple post-judgment hearings in which he alleges that

the State Court and the parties discussed further trial dates regarding disputed property that

remained in the marital home.[80]

For the following reasons, the Court agrees with the Plaintiff that the JOD is a final

---

[78]  *See* Def.'s Br. in Resp. to Pl's Mot. for Summ. J. (Docket # 27 ) at 7-10.

[79]  *See id.* at 8 (emphasis added) (relying on the State Court Opinion (Docket # 1-1) at pdf pp. 84-85).

[80]  *See id*.

judgment for purposes of collateral estoppel. Initially, however, it should be noted that the JOD does not need to be a final judgment in order to be deemed a domestic support obligation. As the Debtor conceded during the hearing on the Motion, it is possible for a non-final order entered in a divorce case, such as an interim support order, to be a domestic support obligation. The Bankruptcy Code's definition of a "domestic support obligation" does not require that the state court order be a final order. The issue of whether the JOD is a final judgment matters only to determine whether the Debtor is precluded, by collateral estoppel, from now contesting the State Court's findings. Those findings are quoted extensively in this Opinion primarily because they show that the Debtor's payment obligations in the JOD are not excessive, under the *Sorah* analysis above. *See* Parts IV.D and V.C of this Opinion.

In any event, the JOD is a final judgment for collateral estoppel purposes.

Mich. Comp. Law § 7.202(6)(a)(i) defines "final judgment" or "final order." It states, in relevant part:

> (6) "final judgment" or "final order" means:
>
> (a) In a civil case,
>
>> (i) the first judgment or order that disposes of all the claims and adjudicates the rights and liabilities of all the parties, including such an order entered after reversal of an earlier final judgment or order[.]

Michigan Court Rule 2.602(A)(3) states: "Each judgment must state, immediately preceding the judge's signature, whether it resolves the last pending claim and closes the case. Such a statement must also appear on any other order that disposes of the last pending claim and closes the case."

Under Mich. Comp. Laws § 600.308(1) and Mich. Ct. R. 7.203(A)(1), the Michigan

Court of Appeals has jurisdiction over, and parties have an appeal of right in, all appeals from

final judgments and final orders from the circuit court.  Mich. Comp. Laws § 600.308(1) states:

> (1) The court of appeals has jurisdiction on appeals from all
> final judgments and final orders from the circuit court, court of
> claims, and probate court, as those terms are defined by law and
> supreme court rule, except final judgments and final orders
> described in subsections (2) and (3). A final judgment or final
> order described in this subsection is appealable as a matter of right.

Michigan Court Rule 7.203 also concerns the jurisdiction of the Michigan Court of

Appeals.  It states, in relevant part:

> **(A) Appeal of Right**. The court has jurisdiction of an appeal of
> right filed by an aggrieved party from the following:
>
> (1) A final judgment or final order of the circuit court, or court of
> claims, as defined in MCR 7.202(6) . . . An appeal from an order
> described in MCR 7.202(6)(a)(iii)-(v) is limited to the portion of
> the order with respect to which there is an appeal of right.

Mich. Ct. R. 7.203(A)(1) (bold in original).

Language in a judgment or order stating that the judgment or order is a final order in

compliance with Mich. Ct. R. 2.602(A)(3) is not controlling with regard to the jurisdiction of the

Michigan Court of Appeals over that judgment or order, and the Michigan Court of Appeals'

exercise of jurisdiction over an appeal of a judgment or order from the circuit court is not proof

of the finality of that judgment or order.  *Palka v. AAA of Michigan*, No. 361695, 2024 WL

1597353, at *3 n.4 (Mich. Ct. App. Apr. 11, 2024); *Stumbo v. Roe*, 957 N.W.2d 830, 833 n.1

(Mich. Ct. App. 2020).  To determine whether a judgment or order appealed from is "final,"

Michigan courts will look at whether that judgment or order states that it is a final order, and will

also look at the manner in which that judgment or order was entered. *See Palka*, 2024 WL 1597353, at *3-4.

In this case, the JOD contained the language required by Mich. Ct. R. 2.602(A)(3), which indicates that it was a final judgment. Paragraph XII.L of the JOD states, in relevant part:

> As may be required by MCR 2.60[2](A)(3), the Judgment of Divorce resolves the last pending claims between the parties as to property division and resolves, subject to further order of the court, the parties' last pending claims as to the issues of custody, parenting time, child support and spousal support.[81]

The State Court again referred to the JOD as a final order in its April 27, 2023 Opinion and Order entitled "**OPINION AND ORDER DENYING PLAINTIFF'S APRIL 25, 2023 EX-PARTE REQUEST TO PROCEED ON MOTION TO MODIFY CHILD SUPPORT AND SPOUSAL SUPPORT WITHOUT POSTING SECURITY OF COSTS PURSUANT TO MCR 2.109 AND WAIVER OF ORAL ARGUMENT PURSUANT TO MCR 2.119(E)(3)**" (the "April 27, 2023 Opinion and Order").[82] The April 27, 2023 Opinion and Order stated, in relevant part: "By way of brief chronology, trial concluded in December 2022, this Court issued its opinion in January 2023, and it was not until April 2023 that a **final** Judgment of Divorce and corresponding support orders were entered in this matter."[83] This shows that the State Court intended the JOD, filed April 6, 2023, to be a final order, and believed it was so.

In addition, the manner in which, and the circumstances under which, the JOD was entered supports the conclusion that it was a final judgment. The JOD was entered more than

---

[81] *See* JOD (Docket # 1-2) at pdf p. 20 ¶ XII.L.

[82] *See* Pl.'s Suppl. (Docket # 42) at pdf p. 53 (capitalization and bold emphasis in original).

[83] *Id.* (emphasis added).

two months after the January 17, 2023 State Court Opinion was entered. This was more than enough time for the parties, in the words of the State Court Opinion, to either "independently reach an agreement regarding the distribution of the [] items" the Debtor listed "(labeled A-P), which the [the Debtor] requested be awarded to him, . . . and/or any credit [the Debtor] is entitled to on his arrearage for those personal property items which were previously sold," or if the parties were not able to reach an agreement, "to contact chambers for a further hearing date on the matter."[84] It is undisputed that neither of the parties contacted the chambers of the State Court for a hearing on the personal property allegedly in dispute, in the more than two months between entry of the State Court Opinion on January 17, 2023 and the entry of the JOD on April 6, 2023. And at the hearing on the Plaintiff's Motion in this Court, the Debtor admitted that, to the best of his knowledge, as of the date of that hearing, neither party had contacted the chambers of the State Court for a hearing on the matter.

Given the ample opportunity the State Court gave the parties to pursue any dispute they had regarding the distribution of personal property after entry of the State Court Opinion, and the failure of the parties to contact the State Court's chambers for a hearing, as permitted by the State Court Opinion, the State Court was justified in concluding that the parties had either independently come to an agreement with regard to the property division, or that they no longer wished to pursue any dispute regarding personal items remaining in the marital home.

The State Court Opinion, filed on January 17, 2023, itself was entered after giving the parties to the divorce an extensive opportunity to litigate all issues in the case, including the division of personal property. As the State Court explained in the State Court Opinion, such

---

[84] *See* State Court Opinion (Docket # 1-1) at pdf pp. 84-85.

opinion was entered after exhaustive litigation of all the issues to be decided in a judgment of

divorce, which included many hearings, and a long trial. The State Court stated:

> From the very outset of these proceedings and throughout the pendency of this matter, the parties have appeared before the Court on countless motions, show cause hearings, and other related matters.[Footnote 1] In excess of thirty motions were contained in the Court records prior to the completion of trial, and the Court heard hours of testimony relative to show cause hearings. . . . [End of Footnote 1] Indeed, trial in this matter was initially completed on September 13, 2022; however, the level of discord between the parties and the open display of hostility during court proceedings prompted the Court to reopen proofs.[Footnote 2] Trial in this matter began on March 21, 2022, and the parties appeared on April 5, 2022, June 21, 2022, August 1, 2022, August 2, 2022, September 12, 2022, and September 13, 2022 before such time as the trial was presumptively completed. On the first day of trial, the parties advised the Court they were entering into an interim stipulated order on custody and parenting time with the hope the interim order would be incorporated in the final Judgment of Divorce. Based on the Court's refusal to accept the parties' stipulated order relative to joint legal custody, the Court reopened proofs to allow additional testimony on the custodial issue. Additional testimony was elicited on November 22, 2022, November 29, 2022, December 12, 2022 and December 22, 2022. [End of Footnote 2] The reopening of proofs culminated in four additional days of testimony relative to the joint legal custody issue.[85]

The JOD also described the extensive proceedings that led to the entry of that judgment,

and it incorporated prior rulings of the State Court, as stated in the preamble to its ruling:

> This matter having come on to be heard upon the Plaintiff Wife's Complaint for Divorce filed herein; this Court having conducted a trial in this matter over 11 dates, and this Court having issued its Opinion and Order on January 17, 2023; Plaintiff having thereafter filed a Motion to Correct Errors and Omissions, the parties and their counsel having appeared by Zoom on February 23, 2023 for a status conference and a hearing on the Motion, and the

---

[85] *Id.* at pdf pp. 2-3.

> Court having made rulings on February 23, 2023 on the record; the relief granted by the Court in its January 17, 2023 Opinion and Order and at the February 23, 2023 motion hearing, all of which are fully incorporated into this Judgment as though fully set forth herein; and evidence having been taken in open Court from which it satisfactorily appears to this Court that there has been a breakdown in the marital relationship to the extent that the objects of matrimony have been destroyed and there remains no reasonable likelihood that the marriage can be preserved:
>
> IT IS ORDERED: . . .[86]

After reciting the lengthy history of the case and incorporating prior rulings, the JOD dissolved the marriage of the parties and stated the terms of the divorce. Those terms included provisions regarding child support for the minor children; spousal support; and the division of property.[87] Paragraph VIII, entitled "**PROPERTY DIVISION**" contains a general provision that applies to both parties; a provision that lays out in detail what specific property is being awarded to Jillian Clark; and a provision that lays out in detail what specific property is being awarded to the Debtor Richard Clark.[88] The JOD, which was entered more than two months after the State Court Opinion, does not mention any outstanding dispute regarding personal property such as the one that was described in the State Court Opinion. And the section in the property division part of the JOD listing what disputed personal property the Debtor Richard Clark is awarded appears on its face to be complete, and to resolve the property division issues.[89] It states that Richard

---

[86] JOD (Docket # 1-2) at pdf pp. 2-3.

[87] *See id.* at pdf pp. 9-11, 13-15, ¶¶ IV (child support), V (spousal support), VIII (property division).

[88] *See id.* at pdf pp. 13-15, ¶¶ VIII.A-VIII.C (bold, capitalization, and underlining in original).

[89] *See id.* at pdf p. 15, ¶ VIII.C.6.

Clark is awarded:

> 6. All of his jewelry, personal belongings and personal effects, premarital items and items gifted to him, and any and all property and furnishing in his possession. Specifically, Plaintiff is required to turn over to Defendant, if in her possession, and by arrangement between the parties the following items:
>
> > ii. Gold chain from Defendant's bar mitzvah;
> >
> > iii. Batman/Superman watches from his childhood;
> >
> > iv. His wedding band;
> >
> > v. His father's toolbox;
> >
> > vi. Any remaining clothing/shoes in the marital home.[90]

For these reasons, both the language in JOD, and the manner in which that judgment was entered, show that such judgment was a final judgment for purposes of collateral estoppel.

Finally, the Court notes that Michigan courts treat judgments of divorce as final judgments for the purposes of both res judicata and collateral estoppel. *See Shipley v. Shipley*, No. 224104, 2000 WL 33406540, at *2 (Mich. Ct. App. Oct. 20, 2000) (citations omitted) ("Just as a judgment of divorce is considered a final judgment entitled to preclusive effect under the doctrine of res judicata, by analogy, a judgment of divorce is also a final judgment entitled to preclusive effect under the doctrine of collateral estoppel.").

Because of collateral estoppel, the Debtor is precluded from contesting the State Court's findings that are quoted and cited in this Opinion.

**E. The Debtor's other arguments are without merit.**

---

[90] *Id.* (error in lettering in original).

52

The Debtor argues that it is impossible to determine what the State Court decided or what it based its findings on. But the Court disagrees; the Debtor's argument is undercut by a careful reading of the State Court's lengthy and very detailed writings — *i.e.*, the State Court Opinion and the JOD.

The Debtor also argues, vehemently, that the State Court judge in the divorce case was biased against the Debtor and actually is corrupt, and that the JOD and the State Court Opinion are wrong and unjust in many ways, are not based on evidence, and are contrary to the evidence presented. All of these harsh criticisms are ones that the Debtor must take up in the state court system, by seeking relief in the State Court from the JOD and/or by appealing the JOD. These arguments are not ones this bankruptcy court may consider; that is precluded by collateral estoppel.

This Court also is precluded from considering the Debtor's arguments by the *Rooker-Feldman* doctrine. In making these arguments in this Court, the Debtor in effect is making an impermissible collateral attack on a state court judgment.

The *Rooker–Feldman* doctrine applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). The *Rooker-Feldman* doctrine bars "a party losing in state court . . . from seeking what in substance would be appellate review of the state judgment in a United States district court[.]" *Johnson v. De Grandy*, 512 U.S. 997, 1005–06 (1994). Under the *Rooker-Feldman* doctrine, a bankruptcy court may not serve as a court of appeals for the state court.

53

*Rooker/Feldman* has often been applied to preclude bankruptcy court review of state court decisions. *See Reitnauer v. Texas Exotic Feline Found., Inc.* (*In re Reitnauer*), 152 F.3d 341 (5th Cir.1998)*; Baldino v. Wilson* (*In re Wilson*), 116 F.3d 87 (3d Cir.1997); *Goetzman* [*v. Agribank, FCB* (*In re Goetzman*)], 91 F.3d [1173,] 1177 [8th Cir. 1996)]; *Besing v. Hawthorne* (*In re Besing*), 981 F.2d 1488, 1496 (5th Cir.) ("'The Bankruptcy Code was not intended to give litigants a second chance to challenge a state court judgment nor did it intend for the Bankruptcy Court to serve as an appellate court.'") (quoting *G & R Mfg. Co. v. Gunia* (*In re G & R Mfg. Co.*), 91 B.R. 991, 994 (Bankr. M.D. Fla.1988)), *cert. denied*, 510 U.S. 821, 114 S. Ct. 79, 126 L. Ed. 2d 47 (1993); *Ferren v. Searcy Winnelson Co.* (*In re Ferren*), 227 B.R. 279 ([B.A.P.] 8th Cir. [] 1998); *Hatcher* [*v. United States Trustee* (*In re Hatcher*)], 218 B.R. [441,] 446–47 [(B.A.P. 8th Cir. 1998]; [*In re*] *Johnson*, 210 B.R. [1004,] 1006 (Bankr. W.D. Tenn. 1997)]; *Beardslee v. Beardslee* (*In re Beardslee*), 209 B.R. 1004 (Bankr. D. Kan. 1997).

*Singleton v. Fifth Third Bank of Western Ohio* (*In re Singleton*), 230 B.R. 533, 537–38 (B.A.P. 6th Cir. 1999).

## VI. Conclusion

For the reasons stated in this Opinion, the Plaintiff is entitled to summary judgment. The Court will enter a separate order granting the Plaintiff's Motion, and determining that all of the Debtor's debt to the Plaintiff under the JOD that is listed in Part IV.B of this Opinion is nondischargeable as a "domestic support obligation."

Signed on August 19, 2024



/s/ **Thomas J. Tucker**
_____
**Thomas J. Tucker**
**United States Bankruptcy Judge**